CORRECTED

# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 22-489V

|  |  |
|---|---|
| CAROLYN SAWYER,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: December 11, 2025 |

*Jonathan Joseph Svitak*, Shannon Law Group, P.C., Woodridge, IL, for Petitioner.

*Alec Saxe*, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON ENTITLEMENT**[1]

On May 2, 2022, Carolyn Sawyer filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on November 20, 2020. Petition at 1.

After review of the record and consideration of the parties' arguments, I conclude that Petitioner has provided preponderant evidence that she suffered the residual effects or complications of her injury for more than six months after onset. Petitioner has also

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

established all other requirements for a Table SIRVA, including onset of pain within 48 hours. Petitioner is therefore entitled to compensation.

**I.      Procedural History**

On July 27, 2022, this case was assigned to the Special Processing Unit of the Office of Special Masters. ECF No. 15. An initial status conference was held on January 30, 2023. ECF No. 20. After delay to Respondent's medical review, Respondent filed a status report stating his position that compensation would not be appropriate in this case, setting forth those objections in his October 27, 2023 Rule 4(c) Report. ECF No. 29 ("Rule 4(c) Report").

On July 30, 2024, I entered a scheduling order setting deadlines for briefing and for Petitioner to file any additional evidence. ECF No. 32. Petitioner filed her brief in support of her Table SIRVA claim on September 13, 2024. ECF No. 33 ("Pet'r Br."). Respondent filed a response brief on October 28, 2024. ECF No. 35 ("Resp't Br."). Petitioner filed a reply brief on November 12, 2024. ECF No. 35 ("Pet'r Reply). This matter is ripe for adjudication.

**II.     Relevant Evidence**

I have reviewed all of the evidence filed to date. I will only summarize or discuss evidence that directly pertains to the determinations herein, as informed by the parties' respective citations to the record and their arguments.

   **A.     Petitioner's Vaccination and Initial Complaint of Left Shoulder Pain**

On November 20, 2020, Petitioner received the flu vaccine in her left arm at a routine wellness and medication refill appointment at her primary care provider ("PCP"), the North Natchitoches Medical Clinic in Campti, LA ("Campti Clinic"). Ex. 2 at 36-39. Petitioner was 67 years at the time of vaccination, and was employed as an accountant. *Id.* at 36-38. She resided very close to her sister, Verna Edwards, and her brother, Lonnie Bradley, and saw them frequently. Ex. 5 at 1-2; Ex. 6 at 1-2. Petitioner had a history of hypertension, anxiety, and insomnia, but did not have any previous left shoulder pain or injury. *See* Ex. 2 at 36-43.

In a declaration, Petitioner asserts that immediately after the vaccination, she experienced an "unusual, intense" pain in her left shoulder and upper arm, which lead her to call the Campti Clinic the next day, November 21, 2020. Ex. 1 at 2. Petitioner claims that she spoke with a nurse, Peggy Byrd, and was told to use a heating pad for pain relief.

*Id.* Due to the risk of COVID-19 exposure, Petitioner attempted to treat her pain at home. *Id.* Petitioner's medical records do not contain any documentation of a November 21, 2020 call to the nurse.

Petitioner further states that over the next two months, she called Campti Clinic "numerous times to complain about the pain and inability to use [her] left arm normally, and was always told that it would just take time to go away." Ex. 1 at 2. According to Petitioner, the Campti Clinic receptionist "recalls [her] many phone calls to the clinic during this time," although Petitioner did not provide any statement from this individual that would corroborate such allegations. *Id.* Petitioner's medical records also do not contain any reference to these calls.

Petitioner's first documented appointment for her left shoulder pain occurred on January 29, 2021, ten weeks after vaccination, at the Campti Clinic. Ex. 2 at 32. Petitioner informed the nurse practitioner at the that she had this pain for "about 2 [months] and that the pain "initially started after she got a flu vaccine[.]" *Id.* Nurse practitioner ("NP") Tina Johnson prescribed a short course of prednisone and methocarbamol. *Id.* at 34.

### B. Petitioner Focuses on Another Medical Issue and Does Not Treat Her Left Shoulder for Seven Months

After the January 29, 2021 appointment, the focus of Petitioner's medical care shifted away from her left shoulder. On May 7, 2021, Petitioner was seen at the Campti Clinic for a different issue. *See* Ex. 2 at 28. Petitioner explained to NP Johnson that she had made the appointment to discuss left breast pain, but this had since resolved and she believed it had been caused by pulling a muscle while cleaning. *Id.* However, Petitioner kept the appointment to discuss a mass on her right arm that had been present for two years (and hence predated vaccination), but was now bothering her and seemed to be getting larger. *Id.* On examination, Petitioner had "normal movement of all extremities," although NP Johnson noted a three-to-four centimeter mass on her right arm. *Id.* at 30. NP Johnson gave Petitioner a referral for this issue. *Id.* NP Johnson also followed-up on Petitioner's hypertension and checked her blood pressure. *Id.*

On May 24, 2021, Petitioner saw Dr. William Ball, a general surgeon at the Natchitoches Regional Medical Center. Ex. 3 at 29. Dr. Ball found a lipoma on Petitioner's right upper extremity and an atypical nevus on the same arm. *Id.* Dr. Ball also listed "left shoulder pain" as one of Petitioner's medical problems, along with hypertension, anxiety, and insomnia. *Id.* However, Dr. Ball's physical examination notes stated that Petitioner had normal movement of all extremities without swelling or muscle tenderness. *Id.* at 31.

Dr. Ball recommended an excision of the lipoma and the atypical nevus. *Id.* at 31. Petitioner underwent this surgery on June 23, 2021. *Id.* at 34.

### C.    Petitioner Resumes Left Shoulder Treatment

On August 5, 2021, Petitioner saw NP Johnson at the Campti Clinic. Petitioner complained of left shoulder pain "since last [N]ovember following a flu shot." Ex. 2 at 54. Petitioner felt that the pain was getting worse, and denied any additional injury to her left shoulder. *Id.* Petitioner described the pain as "intermittent, but persistent," and rated it an 8-9/10 when she raised her arm. *Id.* In terms of pain relief, Petitioner stated that she took Ibuprofen as needed and had tried topical gels without significant improvement. *Id.* NP Johnson ordered x-rays, referred Petitioner to physical therapy ("PT"), and recommended that she take muscle relaxers consistently for the next 7-10 days.[3] *Id.* at 26.

Petitioner returned to the Campti Clinic on August 19, 2021 and stated that she had not yet heard from the PT office after her referral. Ex. 2 at 20. Petitioner repeated the same information about her left shoulder pain and its onset as at the August 5, 2021 appointment, and also again denied any additional injury, fall, or trauma. *Id.* The NP indicated that she would check on the status of the referral and instructed Petitioner to keep taking muscle relaxers as needed. *Id.* at 23.

On August 31, 2021, Petitioner had her initial PT evaluation. Ex. 4 at 13-15. On an intake form, Petitioner wrote that her reason for seeking PT was a "flu shot injury" with an onset of "11/2020." *Id.* at 13. The physical therapist also wrote that Petitioner "received a flu shot in November 2020 since then she has been having [left] lateral shoulder pain and it's gotten worse and worse" until she could no longer lift her left arm above shoulder level. *Id.* at 14. Petitioner engaged in PT sessions approximately one to two times per week thereafter.

While Petitioner was continuing with PT, she saw NP Jennifer Thornton at the Campti Clinic on October 20, 2021 to discuss her hypertension. Ex. 2 at 17. At this appointment, NP Thornton referenced Petitioner's PT due to an "arm injury last year." *Id.* Petitioner complained of increased left arm pain and an inability to sleep, although she did report an improvement in her range of motion. *Id.* NP Thornton also recommended muscle relaxers. *Id.* at 19.

On November 3, 2021, Petitioner saw NP Johnson to follow up on her left shoulder pain and fatigue. Ex. 2 at 12. Petitioner again described her complaint as "left shoulder pain following a flu vaccine last [year]." *Id.* Petitioner stated that the muscle relaxers

---

[3] The x-ray results were unremarkable. Ex. 2 at 54.

4

helped, but had not resolved her pain. *Id.* Additionally, Petitioner was feeling "down" because the physical therapist had said that she may not get full range of motion back in her arm and should have come sooner to PT. *Id.* NP Johnson advised Petitioner to keep going with PT and prescribed prednisone and diclofenac topical gel. *Id.* at 15.

Petitioner attended 22 sessions of PT between August 31, 2021, and February 1, 2022. Ex. 2 at 14-37. In January 2022, Petitioner began to report that she was feeling good and did not have pain. Ex. 4 at 33-37. Petitioner was discharged from PT on February 1, 2022 with the comment "doing very well" and a pain rating of 0-2/10. *Id.* at 36-37. Petitioner did not file any additional treatment records.

### D.    Declaration Evidence

Petitioner filed her first declaration on May 6, 2022.[4] As stated above, Petitioner described contacts with the Campti Clinic between November 21, 2020, and January 29, 2021 that are not documented in her medical records. *See* Ex. 1 at 1-2. In terms of the treatment gap, Petitioner explained that after her January 29, 2021 appointment, she "continued to experience significant pain" in her left shoulder and "increasing loss of range of motion," but due to the potential for COVID-19 exposure decided to "prioritize [her] needs for medical attention to minimize [her] trips to the doctor." *Id.* at 2. Petitioner felt that the removal of a potential skin cancer on her right arm trumped the need to address left shoulder pain that "though debilitating, was not potentially fatal." *Id.* at 2-3. Petitioner stated that "[a]s the spring/summer COVID surge was abating," she was "finally able to secure an appointment" in August 2021 to see NP Johnson. *Id.* at 3. Petitioner also denied that PT had been as helpful as suggested by the PT notes, stating that her left shoulder "is nowhere near 100% back to normal." *Id.* at 4.

Petitioner's younger sister, Verna Edwards, also provided a declaration dated May 6, 2022. Ex. 5 at 1-2. Ms. Edwards resides next door to Petitioner. *Id.* at 1. Ms. Edwards stated that she and Petitioner spoke on the phone on November 20, 2020, just after she had received the flu vaccine, and Petitioner said that she was in intense pain. *Id.* at 1. Petitioner also went to Ms. Edward's house on November 21, 2020 and complained of left shoulder pain. Ms. Edwards stated that since the vaccination, Petitioner has complained to her daily about the pain. *Id.* at 1-2. Ms. Edwards has also observed Petitioner having difficulty performing household chores and other daily tasks due to the pain and limited range of motion in her left shoulder. *Id.* at 2.

---

[4] The declarations filed in this matter were signed under penalty of perjury pursuant to 28 U.S.C. § 1746.

5

Petitioner's younger brother, Lonnie Bradly, submitted a very similar declaration. Mr. Bradley also lives near Petitioner. Ex. 6 at 1. Mr. Bradley stated that he spoke with Petitioner on November 20, 2020, about her intense pain from the flu vaccine. *Id.* Like Ms. Edwards, he also saw her on November 21, 2020, and heard her complaints of left shoulder pain on that day and continuing thereafter. *Id.* Mr. Bradley declared that "[o]ver the next few months," he observed Petitioner keeping her left arm folded to avoid movements. *Id.* at 1-2. Mr. Bradley "checked in on Petitioner almost daily out of concern for her left arm and shoulder pain." *Id.* at 2.

On July 12, 2023, Petitioner filed a second declaration. Ex. 7 at 1. Although her first declaration only stated that she contacted the Campti Clinic numerous times *before* the January 29, 2021 appointment, Petitioner now added that *after* this time, she continued to call and speak with a receptionist or nurse about her symptoms. *Id.* at 2. Petitioner stated that the Campti Clinic personnel told her to continue using the same remedies. *Id.* Petitioner also explained that at the May 7, 2021 appointment regarding her right arm, she was still experiencing left shoulder pain, but she was not asked any questions about it and her left shoulder was not examined. *Id.*

## III.     Ruling on Entitlement

### A.     Legal Standards

To receive compensation under the Vaccine Program, a petitioner must prove either (1) that he suffered an injury falling within the Vaccine Injury Table, or (2) that he suffered an injury that was actually caused by his vaccine. *See* Sections 13(a)(1)(A), 11(c)(1). Under either method, however, a petitioner must demonstrate that the injured person has "suffered the residual effects or complications of his illness, disability, injury, or condition for more than six months after the administration of the vaccine."[5] Section 11(c)(1)(D)(i). Cases may appropriately be dismissed for failure to substantiate the severity requirement. *See, e.g.*, *Hinnefeld v. Sec'y of Health & Hum. Servs.*, No. 11-328V, 2012 WL 1608839, at *4–5 (Fed. Cl. Spec. Mstr. Mar. 30, 2012) (dismissing case where medical history revealed that petitioner's Guillain-Barré Syndrome resolved less than two months after onset).

The petitioner carries the burden of establishing the matters required in the petition, including the severity requirement, by a preponderance of the evidence. Section 13(a)(1)(A); *see Song v. Sec'y of Health & Hum. Servs.*, 31 Fed. Cl. 61, 65-66 (1994),

---

[5] Petitioner does not allege, nor would the evidence support, either alternative for establishing the severity requirement: that the alleged injury resulted in death, or "inpatient hospitalization and surgical intervention." Section 11(c)(1)(D)(ii), (iii).

*aff'd*, 41 F.3d 1520 (Fed. Cir. 2014). Congress has stated that the severity requirement was designed "to limit the availability of the compensation system to those individuals who are seriously injured from taking a vaccine." H.R. REP. 100-391(I), at 699 (1987), reprinted in 1987 U.S.C.C.A.N. 2313–1, 2313–373, cited in *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011), *cert. denied,* 132 S.Ct. 1908 (2012); *Wright v. Sec'y of Health & Hum. Servs.*, 22 F.4th 999, 1002 (Fed. Cir. 2022).

The Vaccine Act prohibits finding that a petitioner has met this burden "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a). Medical records must be considered, *see* Section 13(b)(1), and are generally afforded substantial weight. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, the Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). The factual matters required to prove elements of a Vaccine Act claim may be established by a *mix* of witness statements and record proof, with the special master required to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 (2013) (citing Section 12(d)(3); Vaccine R. 8), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological

7

abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

### B. Petitioner Has Established Severity by a Preponderance of the Evidence

In order to meet the statutory six-month severity requirement, Petitioner must demonstrate, by a preponderance of the evidence, that she suffered the "residual effects or complications" of her claimed injury beyond May 20, 2021. *See* Section 11(c)(1)(D)(i). Respondent's challenge to severity is based on Petitioner's lack of treatment for her left shoulder between January 29 and August 5, 2021. Rule 4(c) Report at 5-6; Resp't Br. at 5-9. Respondent emphasizes that in the first six months after the November 20, 2020 vaccination, Petitioner was treated for left shoulder pain just once. *See* Rule 4(c) Report at 5; Resp't Br. at 6. Respondent also notes that Petitioner did not mention any left shoulder pain and had normal physical examinations at her May 2021 appointments addressing her right arm mass and atypical nevus. *See id.*

8

To rebut this argument, Petitioner cites several cases in which the severity requirement was satisfied despite significant treatment gaps. Pet'r Br. at 12-13 (citing *Loughren v. Sec'y of Health & Hum. Servs.*, No. 19-1463V, 2023 WL 6536210 (Fed. Cl. Spec. Mstr. Sept. 6, 2023); *Lamine v. Sec'y of Health & Hum. Servs.*, No. 20-1560V, 2023 WL 4881504 (Fed. Cl. Spec. Mstr. June 30, 2023); *Mullen v. Sec'y of Health & Hum. Servs.*, No. 20-1743V, 2023 WL 7161745 (Fed. Cl. Spec. Mstr. Sept. 28, 2023); *Fey v. Sec'y of Health & Hum. Servs.*, No. 20-1832V, 2023 WL 5606239 (Fed. Cl. Spec. Mstr. July 26, 2023)); Pet'r Reply at 2-3 (citing *Nielsen v. Sec'y of Health & Hum. Servs.*, No. 21-0590V, 2024 WL 4328583 (Fed. Cl. Spec. Mstr. Aug. 23, 2024); *Ferguson v. Sec'y of Health & Hum. Servs.*, No. 21-0046V, 2024 WL 1675051 (Fed. Cl. Spec. Mstr. Mar. 18, 2024)). In response, Respondent argues that these cases are distinguishable because they involved more treatment before the start of the gap, such as multiple PCP visits and PT sessions; here, by contrast, Petitioner only had a single appointment. Resp't Br. at 7-8. Petitioner acknowledges in her reply that she underwent less treatment following vaccination, but maintains that her medical evidence is otherwise similar to what has been accepted to meet the burden of proof. Pet'r Reply at 2-4.

Although Petitioner's cases are not particularly factually analogous, they support the well-established principle that a seven-month treatment gap does not automatically preclude a favorable severity finding. *See Law v. Sec'y of Health & Hum. Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Mar. 27, 2023). Respondent conflates the quantity of formal treatment (especially pre-gap) with the duration of the residual effects of the claimed injury. Evidence that a petitioner underwent extensive treatment shortly after vaccination may assist in proving severity by demonstrating that her symptoms would not be expected to resolve within six months. *See, e.g.*, *Fey*, 2023 WL 5606239, at *5. However, there is no specific level of treatment that must be reached during the six-month window, or prior to the start of a treatment pause. *See* Resp't Br. at 8-9. Respondent's argument ultimately speaks to the *severity of the injury*, and thus is relevant to damages, but does not end the analysis on this aspect of entitlement.

Respondent further ignores that at the August 5, 2021 appointment, NP Johnson recorded that Petitioner was *still* experiencing left shoulder pain, that she felt it was getting worse, and that she had tried over-the-counter remedies without success. Ex. 2 at 24. Petitioner continued to link her pain and limited range of motion to the November 20, 2020 flu vaccine at her August 19, 2021 follow-up appointment, her PT evaluation, and her later appointments at the Campti Clinic (on October 20, 2021 and November 3, 2021). *See* Ex. 2 at 12, 17, 20; Ex. 4 at 13. Petitioner's seemingly-normal musculoskeletal examinations

9

in May 2021 are admittedly not supportive of her claim.[6] However, the overall impression from the record is that Petitioner's left shoulder symptoms had not resolved by that point.

In addition, Petitioner's description of worsening pain at her August-November 2021 appointments, particularly her description of her lack of success self-treating with Ibuprofen and topical gels, overcomes any suggestion that her left shoulder symptoms did not continue beyond May 2021.[7] Petitioner reported her symptoms status for the purpose of obtaining medical treatment, and I give those statements significant weight on that basis. There is not a lack of "objective record evidence," as Respondent asserts, and I do not rely solely on her declaration testimony. *See* Rule 4(c) Report at 5. Petitioner was also not required to obtain "orthopedic treatment or radiographic findings connecting her vaccination to her left shoulder complaints" when she resumed treatment. *See id.* There is sufficient evidence in this record that Petitioner's symptoms from August 2021 onward represented a continuation of the original injury to deem severity established.

Respondent's attack on Petitioner's stated rationale for the treatment gap is not persuasive. Respondent questions Petitioner's explanation that she delayed treatment due to the COVID-19 Pandemic, noting that she was fully vaccinated against the virus by March 9, 2021 (and hence in the midst of the gap). Resp't Br. at 6. However, Petitioner does not just rely on the COVID-19 Pandemic in general, but makes clear that to minimize COVID-19 exposure, she chose to prioritize treating her right arm mass, which she feared could be cancerous, over her left shoulder pain. Ex. 1 at 2; Ex. 7 at 2. Again, this choice to forego treatment is relevant to damages – but based on her medical records, I cannot conclude that she did not likely have any left shoulder symptoms during this time.

I also do not find that there was an intervening cause that would explain Petitioner's symptoms. Respondent argues that a new injury was more likely than not the source of Petitioner's left shoulder pain after the treatment gap, because she mentioned left breast pain at her May 7, 2021 appointment. Resp't Br. at 6 (citing Ex. 2 at 28). However (and separate from the fact that the left breast and left shoulder are distinct parts of the body), Petitioner attributed this pain to pulling a muscle while cleaning, and stated that it had already resolved. Ex. 2 at 28. Further, Petitioner repeatedly denied any new injury at her August 2021 appointments. *Id.* at 20, 54. I also do not perceive any credibility concerns in Petitioner's characterization that she prioritized her right arm even though she

---

[6] Petitioner's left shoulder pain was listed as a medical problem at her May 24, 2021 appointment with Dr. Ball, despite the finding of normal movement of extremities and no swelling or muscle tenderness. *See* Ex. 3 at 29, 31.

[7] In making this finding, I give little weight to Petitioner's declaration statements that she called the Campti Clinic to complain of left shoulder pain both before and after the January 29, 2021 appointment. Although I have no reason to disbelieve Petitioner, these contacts were not documented.

admittedly made the May 7, 2021 appointment to discuss her left breast pain, and the right arm mass had been present for some time. *See* Resp't Br. at 6. Petitioner has preponderantly demonstrated that she suffered the residual effects of her injury for more than six months post-vaccination.

### C. Petitioner Has Established the Onset of Left Shoulder Symptoms Within 48 Hours Post-Vaccination by Preponderant Evidence

In addition to severity, Respondent also challenges onset, arguing that Petitioner did not complain of left shoulder pain until seventy days after vaccination, and then described it vaguely, as occurring "after" or "following" vaccination. Rule 4(c) Report at 7; Resp't Br. at 9-10. According to Respondent, there is no "independent evidence" to support onset and Petitioner only offers "anecdotal evidence" to support her claim. Resp't Br. at 9-10.

Respondent analogizes the facts of this case to three decisions in which I found a lack of preponderant evidence for a 48-hour onset. Resp't Br. at 9 (citing *Rose v. Sec'y of Health & Hum. Servs.*, No. 20-0056V, 2022 WL 4128908 (Fed. Cl. Spec. Mstr. Aug. 10, 2022), *Bulman v. Sec'y of Health & Hum. Servs.*, No. 19-1217V, 2021 WL 4165349 (Fed. Cl. Spec. Mstr. Aug. 12, 2021), and *Pitts v. Sec'y of Health & Hum. Servs.*, No. 18-1512V, 2020 WL 2959421 (Fed. Cl. Spec. Mstr. Apr. 29, 2020)). However, these cases are distinguishable, because they all involved longer delays in seeking treatment as well as intervening examinations that would have been likely to detect the alleged shoulder pain if it had been present. *Rose*, 2022 WL 4128908, at *4; *Bulman*, 2021 WL 4165349, at *3-4; *Pitts*, 2020 WL 2959421, at *5. Further, in *Pitts*, the petitioner specified to one treater that his pain began a *week after* vaccination. 2020 WL 2959421, at *4. In those circumstances, the combination of vague descriptions of onset (or contradictory descriptions), extended time since vaccination, and intervening appointments lead me to conclude that even though the "standard applied to SIRVA claims on the onset issue is fairly liberal," the "sequential and contemporaneous record does not lend overall support to the [p]etitioner's allegations." *Rose*, 2022 WL 4128908, at *4; *Bulman*, 2021 WL 4165349, at *5; *Pitts*, 2020 WL 2959421, at *6.

Here, the facts fall on the other side of this line. Although Petitioner did not directly state that her pain began within 48 hours of vaccination, "petitioners are not required to point to records setting forth with chronographic specificity the precise day and hour that their onset manifested." *Flores v. Sec'y of Health & Hum. Servs.*, No. 20-1858V, 2023 WL 4248571, at *5 (Fed. Cl. May 24, 2023). Within the Vaccine Program, terms like "since," "shortly after," and "following" the vaccination are typically understood to "mean *very* close in time – immediately, or at most within a day or two" after vaccination. *Flowers v. Sec'y*

*of Health & Hum. Servs.*, No. 20-285V, 2024 WL 2828211, at *11 (Fed. Cl. Spec. Mstr. May 8, 2024), *mot. for rev. den'd*, 173 Fed. Cl. 613 (2024). Petitioner also did not have any intervening appointments and never suggested an alternate onset.

Nor is her delay of two and a half months before first seeking treatment wholly attenuated or untimely. *See Flores*, 2023 WL 4248571, at *5. I have often stated that it is common for SIRVA petitioners to delay seeking treatment, thinking the injury will resolve on its own. Petitioner's declarations and those of her siblings, who saw her frequently, corroborate her medical records and reduce their vagueness.

Respondent's demand for "independent evidence" of onset is thus uncompelling. *See* Resp't Br. at 10. I reject Respondent's argument that Section 13(a) of the Vaccine Act, which prohibits a finding of entitlement "based on the claims of a petitioner alone, unsubstantiated by medical records or medical opinion," precludes me from relying on medical records that contain a petitioner's reported history of onset. *See id.* If this were correct, no petitioner would be able to make out a claim, given that most SIRVA cases begin with a subjective report of shoulder pain to a medical provider.

Petitioner has demonstrated that the onset of shoulder pain more likely than not began within 48 hours of vaccination. However (and consistent with the aforementioned severity issues), Petitioner's delay and decision to forego treatment suggest that she suffered a milder SIRVA injury. Any award in this case for pain and suffering should be modest.

**Conclusion and Scheduling Order**

Respondent does not raise any other objections to entitlement. *See generally id*. Based on my independent review, I find that Petitioner has preponderantly established all requirements for a Table SIRVA claim. 42 C.F.R. § 100.3(c)(10). Accordingly, she need not prove causation-in-fact. Section 11(c)(1)(C). I also find that Petitioner has satisfied all other statutory requirements. Section 11(c)(A), (B), and (D).

For the foregoing reasons, **I find that Petitioner has established entitlement and is thus entitled to compensation for a Table SIRVA following the November 20, 2020 flu vaccination.**

The case is now formally in the damages phase. The parties are encouraged to pursue informal resolution of an appropriate damages award. If the parties determine that informal resolution is not possible, they should be prepared to promptly brief the appropriate award of damages.

**By no later than Monday, January 12, 2026**, Petitioner shall file a Status Report updating me on the parties' efforts towards informally resolving damages.

**IT IS SO ORDERED.**

                                                               **s/Brian H. Corcoran**
                                                               Brian H. Corcoran
                                                               Chief Special Master